UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. _____24-cv-23602-KMW_____Civ (Judge's _____Magistrate_____

Anthony Parks

Vs.

Clifton Levin
        Defendant One

Fius Distributors LLC
D.B.A. Inada USA, D.B.A.
Furniture For Life
        Defendant Two

Roy E. Granoff
        Defendant Three

David L. Kessler
        Defendant Four

The Law Offices of Granoff & Kessler
        Defendant Five

Carolina Verrier
AKA Carolina Streidinger Verrier
        Defendant Six

Family Inada Co Ltd
        Defendant Seven

FILED BY____MC____D.C.

SEP 18 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

1

COMPLAINT

COUNT ONE

I Anthony Parks, Plaintiff, in the above style cause, sue defendants, Clifton Levin,

Fius Distributors, LLC (dba Inada USA & Furniture for Life), Roy E. Granoff, The law Offices

Of Granoff & Kessler, Carolina Verrier (AKA Carolina Streidinger Verrier), Family Inada Co

Ltd.

This action is filed under 18 U.S. Code 1962 & 1964 (RICO). Also U.S. Code 1038 (b).
Also U.S. Code1341.

Further Jurisdiction of this court: This action comes under multi state jurisdiction rules in
That plaintiff is a New York resident, Roy E. Granoff and the law offices of Granoff & Kessler
Are residents and or do operate in the State of Florida, Clifton Levin and Fius Distributors
Are residents of the state of Colorado and Carolina Verrier is a resident of the State of
Florida.

The amount in controversy exceeds $100,000.

This court has jurisdiction.

***Overview***.

1.  This complaint is a continuation of a scheme by the listed parties to falsely

Create a judgment against plaintiff, through fraud, deception, forgery, etc.

That caused severe, personal, physical and mental damage to plaintiff, while

At the same time benefitting themselves personally.

2.  Their actions collectively are clearly violations of the Federal

Civil RICO Act under 18 U.S. Code 1964 & 1962. And the other applicable

Laws cited above.

***History***:

3.  The willful and deliberate schemes of the parties involved cover a span from 2006-

2022 (main acts) and continue till this day.

4.  Between 2006 and 2007 plaintiff purchased two Inada Massage chairs from

Defendant Inada, one directly from defendant Inada, the second through defendant

Inada's retailer Relax You Back. Defendant Inada did service the first chair from 2006

Till early 2007, Defendant Inada publicly announced that they were transferring

Sales, Service and marketing to Fius Distributors in late summer of 2007, after August 10,

2007. Plaintiff relied on that representation, ***Exhibit A.***

## DEFENDANT FAMILY INADA FIRST CONTACTED:

5.  Sometime in the fall of 2007 (after August) plaintiff contacted Fius about some

Serious operational problems (the chair would mis scan and massage that back of my head

which could cause injury) with both machines at their Colorado location. Fius refused

to make any attempts at repairing, stating that they had no intention of **"fixing anything"**.

In 2008 Plaintiff filed action in small claims court in Miami to enforce the warranty

provisions which the chair was under at that point.

6.   Defendant Fius/ Clifton Levin retained the services of Roy Granoff of Granoff

& Kessler to represent Fius and Clifton Levin. At that time Fius had not been officially

Incorporated so I included Clifton Levin in the complaint as he is the named President

and owner at the time the complaint was filed in Miami Dade Small Claims Court.

The complaint Case number is 08-9236 SP 05.

***Now Comes The Big Lie***:

7.   Upon the second hearing Attorney Granoff confronted plaintiff and threatened

Plaintiff stating That if I did not withdraw my complaint, he was going to file a motion under

FL 57.105 for attorney's Fees, **Exhibit B**, Indeed Granoff did just that, with a supporting

affidavit drafted by Roy Granoff and signed by Clifton Levin stating. In summary Clifton

Levin's affidavit stated in **Exhibit C**. ***Paragraph 4*** that "***There is no contract between Fius
and the Plaintiff. Any contract Plaintiff has is with Inada Family and not Fius or Cliff
Levin. Defendants did not assume the liabilities of Inada Family, only the
distributorship of their products.***"

8.   Plaintiff presented the formal written notice from Inada's public announcement

But Granoff's contention and representation to the court was that said notice was

**"Hersay"**.

9.   As a result, my plaintiff's case was dismissed and Attorney Granoff received

A Judgment against plaintiff for attorney's fees in the amount of over $9475.00. In

2014 **Exhibit D.**

Defendant Granoff Forged Plaintiffs Signature on U.S.
Postal Return Receipt:

10. During a hearing in 2020 under the 2008 9236 SP 05

During a hearing on 2020 Granoff was confronted with the fact that did he
He send a safe harbour letter to plaintiff, pursuant to FL57.105. He did not
But the next day Granoff filed a fake (defective) safe harbor letter with a
forged postal receipt that two expert's plaintiffs hired certified the receipt
As a forgery. **E & F.**

**FAMILY INADA FIRST CONTACTED:**

11. After several months of attempting to contact the manufacturer Fius in Japan, plaintiff called defendant Inada and spoke to their Vice President, Masaru Hanada Acknowledged That he had been contacted by Fius' President, Clifton Levin and was told that They were made aware of my case and that he, Levin would take care of it and they need not do anything further, that includes initiating any repairs. Plaintiff asked Masaru Hanada if there was a contract between Family Inada, as they publicly announced back in 2007 that their sales, service and marketing was transferred to Fius, and is there a contract that states that. Hanada stated that that they have the document, but he refused to allow plaintiff to obtain a copy as requested.

12. After various subsequent actions in two other related cases for the second Massage chair, fast forward to February 15, 2018, plaintiff was awoken at approximately 6:00 A.M. plaintiff was awakened to the Miami Dade (sheriff) police department at his House in Miami Beach, who came to seize two of plaintiff personal cars, a Mercedes SLK sports car and Lexus LX 450, **Exhibit's G & H** The Sheriff impounded both vehicles and attempted to sell them at auction, but because plaintiffs late Father's estate was the original Lienholders they were no buyers, so the vehicles were turned over to Granoff and Levin. Their actions caused Plaintiff to file a Bankruptcy petition to stop the sale but that was not successful, it only delayed it.

***SALE DID NOT WIPE OUT LIENHOLDER:***

13. The sale of the two vehicles did not wipe out the lienholder status.

***DEFENDANT FAMILY INADA WAS CONTACTED AGAIN:***

14. Sometime in 2018 defendant Inada was contacted again, about this

Situation and the Vice President, Masaru Hanada claims that the manufacturer

of the part that the massage chairs that I bought form them had filed for

Bankruptcy and there is nothing that they could do, but they sympathized with what

I was going through.

<div align="center">COUNT TWO</div>

**A Second Sheriffs Seizure:**

15. On or about September of 2018 plaintiff was again awakened this time in the

Afternoon. With a new demand and exhibit request from Roy Granoff, this time

The sheriff stated that Granoff did not get enough money from the first two cars

And that they wanted to seize Plaintiffs 2004 Toyota Tundra. Which the Sheriff

also impounded. This scheme caused a further loss to plaintiff.

16. In December of 2018 plaintiff posted a bond to stop the seizure of the

In the amount of $2400.00. In a dispute with the court and false representation

By Attorney Roy Granoff he convinced the court that even though the sale

went through and was not stopped that the $2000.00 should go to Granoff in

that Fius had a judgment that was still not completely satisfied and that the

bond for 2000.00 should go to defendant Fius towards Granoff's attorney's fees.

Again, an additional loss of $2000.00 to plaintiff.

17. In respects to the Plaintiffs Toyota Tundra plaintiff was able to retrieve

The vehicle back by way of the Supreme Court of New York and combination

Of the New York Surrogate Court. See the attached order of Judge Sam Walker

***Exhibit J.***

18. In January 2019 Attorney Granoff on behalf of Fius obtained an amended Judgment to add over $36,320.81 in legal fees, with interest totaling $45,795.81. Replacing the original judgment of $9475.00. **Exhibit K.**

19. On January 13, 2022, Attorney Granoff sought an additional $5501.00 in Attorney's fees from plaintiff in a separate but related case regarding the Toyota Tundra under Miami Dade Case No. 2018-041935 CA 01. And it was awarded By the Honorable Judge Charles Johnson. Johnson did not have much of a Choice since this was the result of an appeal, however after plaintiff disclosed The Fraud that was going on with Granoff, **Judge Johnson made it clear that he would Encourage Plaintiff to bring back the action or pursue whatever remedies exist. Exhibit L**.

**THE BIG LIE IS HAS BECOME UNRAVELED**:

20.  Based on the record during 2019 Family Inada filed a Federal Case in the District of Wilmington Delaware to stop Fius and Clifton Levin from selling their products and Property rights infringement under case no. 19-925-CFC.

21. Plaintiff was not aware of this action until sometime in either late 2020 or Early 2021. Sometime in 2022 Once plaintiff became aware this was brought before the attention of the Original Miami-Dade small claims case **2008 9236 SP 05.**

22. What was discovered in the Delaware Federal Case is that Defendant Fius Byway of Clifton Levin was contracted to repair Inada massage chairs since 2007, to "sell, service and market". This was revealed through the declaration of **Masaru Hanada** the Vice President of Family Inada Co, LTD, **Exhibit M.**

**FAMILY INADA PART OWNER OF FIUS**:

23. It was also discovered from the Delaware case that Defendant Fius Is jointly owned by Family Inada. In Fact, F.I.US stands for FAMILY INADA US. In fact Defendant Family Inada had full knowledge of the events of its U.S. Counterparts and did nothing to stop or curtail the actions. Family Inada is just as responsible for the Fraud being joint owner of FIUS and having knowledge and benefits from not having to effectuate warranty repairs.

24. The bottom line is that there is now documentation in United States District Court under the Delaware Case with many supported, undisputed Documents that prove the Fius and Levin were legally obligated under contract to repair plaintiffs' chairs and concocted a scheme with defendant Roy E. Granoff, also in conjunction with Granoff & Kessler and David Kessler To defraud Plaintiff. The Defendants together sought to obtain Judgments by Fraud and seized over $150,000 in personal property to benefit themselves Through this fiendish scheme that has lasted over 17 years till this present Day. This is in violation of 18: USC 1962 & 1964, also U.S. Code 1038 (b).

Also U.S. Code1341. In addition, Family Inada is guilty of fraudulently publishing An assignment that they refused to enforce by their bad acts **Exhibit A**.

25. During a proceeding in Miami Dade Attorney, Roy Granoff, knowing full well And having full knowledge knowing that plaintiff is aware of the Delaware Federal Action made a comment, **"it's not what know it's what you can further do!"**.

26. After plaintiff recovered the Toyota Tundra through the New York Supreme Court, defendants Clifton Levin, Fius Distributors LLC, Roy Granoff, David Kessler, The Law Offices of Granoff & Kessler, Family Inada CO LTD, by their fraudulent acts and negligence Caused plaintiff to be initially arrested by the New Police Department. However, it is Well to note that after approximately 60 minutes Plaintiff was released after getting information From Florida that this was a civil dispute and not a criminal matter.

27. However, because of the New York Court action a separate action was Filed in Florida against Plaintiff for car theft which has not been adjudicated yet. Again, supposedly attorney Granoff is playing a role in and is listed as an expert, Which Granoff certainly has the right to do, In that case. Based on any false statements or misrepresentations plaintiff will amend this case.

RICO ILLEGAL PROFITS:

28. Roy Granoff, David Kessler and the Law Firm of Granoff & Kessler gained Over $30,000 in legal fees from Defendant Clifton Levin and Defendant Fius, according To Granoff in legal fees. In the process they gained over $150,000 in assets, cash and judgments and personal property Collectively from plaintiff. See **Exhibit N,** an email from Granoff bragging as receiving good money for the assets and sale of plaintiffs two cars.

## COUNT THREE

Clifton Levin:

    29. Clifton Levin is in violation of the U.S. (Civil) RICO act under 18: 1962 & 1964

    18: 1038 (b) & 18: 134. Based on all the above. Clifton is in violation of all

    The above from paragraphs 1-28.

## COUNT FOUR

    30. Fius Distributors LLC:
        Is guilty of violation and scheming of all that above 1-27.
        Civil) RICO act under 18: 1962 & 1964 18: 1038 (b) & 18: 134. Based on all the above.

## COUNT FIVE

    31. Roy Granoff is Guilty of violation of
        Civil) RICO act under 18: 1962 & 1964
        18: 1038 (b) & 18: 134. Based on all the above.

## COUNT SIX

    32. David Kessler:
        Participated as part and partner of Granoff and Kessler appeared on several

        And colluded with the court to deprive plaintiff of both cars. On one occasion

        Kessler had an illegal exparte with the court to derail and stay order behind plaintiffs

        Back.

## COUNT SEVEN

33. Carolina Verrier (aka Carolina Streidinger Verrier):

    Verrier is a friend of Attorney Granoff and is in possession of the plaintiff's

    Mercedes SLK and has been hiding it. Verrier is obligated to make payments

    To the Estate as it was sold to Verrier with a lien, that plaintiff is obligated to

    Pay. As a result, Verrier is participating in this scheme for being in possession of

    Property and not paying for it.

34. Plaintiff seeks damages in the amount of $20,000,000.

    Plaintiff seeks a trial by Jury. Plaintiff also seeks attorney's fees

    For incoming attorney.


Anthony Parks

September 16, 2024

130 W. Pleasant Ave
#327
Maywood, N.J. 07607

561-703-1283
561-703-2272

**INADA**
Massage Chairs

Home

About Us

Press Release

Contact Us

A Message from Inada USA

In the late summer of 2007, Family Inada, Inc. transferred exclusive responsibility for the American market to FIUS Distributors LLC.

FIUS Distributors LLC is based in Boulder, Colorado and operates as Inada Massage Chairs.

Warranty repair service and support, marketing, and distribution for all Inada activity in the United States is provided seamlessly through FIUS Distributors LLC. (www.inadausa.com)

---

**FIUS Distributors LLC**
**2125 32nd St**
**Boulder, CO, 80301, USA**

**Toll-Free: 888.769.0555**
**E-mail: info@inadausa.com**

---

Inada Massage Chairs are available at over 250 authorized retail locations across the country. Please visit www.inadausa.com/dealer-location for a massage chair showroom near you. Please note that the Manhattan showroom location will be closed to the public after August 10, 2007.

Major merchants carrying Inada products include SkyMall, Hammacher Schlemmer, Relax the Back, and the Healthy Back Store.

The main United States site for Inada is www.InadaUSA.com. You may also call **888.769.0555** or email info@inadausa.com for additional information.

Please email us your feedback at info@inadausa.com.

Copyright © 2007 FAMILY INADA INC .

Circuit Court in and For Miami Dade County,
Florida

Case No. 2018-041935-CA-01

Anthony Parks

Vs

Fius Distributors LLC
Et All

Paradise Auto Brokers

NOTICE OF FILING

Plaintiff hereby files the following:

A. Inada 2007 Notice of Assignment to Fius
B. Fius- Clifton Levin Affidavit
C. Filing of Masaru Hanada
D. Federal Injunction Order of Inada Vs Fius
   Case No. 1:19-CV-00925-CFC-CJB

**A**

**B**

*(Ex B)*

Electronically Filed 01/22/2013 10:36:31 AM ET

IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION
CASE NO. 08-9236 SP 05 (04)

ANTHONY PARKS,

    Plaintiff,

vs.

FIUS DISTRIBUTORS, LLC and
CLIFTON LEVIN,

    Defendants.

_____/

**DEFENDANTS' AMENDED**
**MOTION TO DISMISS**

    Defendants, FIUS DISTRIBUTORS and CLIFTON LEVIN, through the undersigned counsel files this, their Amended Motion to Dismiss, and state as follows:

    1.    Plaintiff alleges that the distributorship was turned over to Cliff Levin. Plaintiff relies on the "Message from the President" attached to his Amended Complaint. The "Message" states that the distribution was turned over to FIUS. No where in the document is Cliff Levin mentioned. Cliff Levin never entered into a contract with the Plaintiff, nor was that alleged by Plaintiff in his Amended Complaint. There is no cause of action stated against Cliff Levin. See attached Affidavit of Cliff Levin, Exhibit "A."

    2.    The "message from the President" that the Plaintiff attached to the Amended Complaint states that Family Inada transferred its business operations to FIUS Distributors. The message stated that service will be provided through the distributor. As such, FIUS will provide service on INADA products but FIUS did not assume liability for the warranty issues alleged in Plaintiff's Amended Complaint. As such, FIUS should be dismissed as a party of this lawsuit.

    3.    The "message" stated that FIUS would provide service. FIUS did not assume the liabilities of Family INADA. There is no cause of action stated against FIUS. FIUS did not enter into a contract with the Plaintiff, nor is one alleged in Plaintiff's Amended Complaint.

    4.    There is no contract between FIUS or Cliff Levin and the Plaintiff. Any contract Plaintiff has is with INADA Family and not FIUS or Cliff Levin. Defendants did not assume the liabilities of INADA Family, only the distributorship of their products.

    5.    No distribution problems were alleged by Plaintiff in his Amended Complaint, as there were no distribution problems. As such, FIUS and Cliff Levin have no liability for any warranty issues involving Mr. Park's claims.

6.      Defendants did not make the chair in question. Defendants did not sell the chair in question to the Plaintiff. There exists no basis for Defendants to be held responsible for any manufacturing defects in the chair.

7.      INADA made the chair. INADA sold the chair. Any warranty issue Plaintiff has is with INADA. Defendants simply do the warranty work for Inada but the warranty itself is with Inada who is the manufacturer of the chair in question.

8.      Plaintiff fails to state a cause of action against either Defendant.

9.      Undersigned has provided Plaintiff with the Safe Harbor Letter and requests the award of attorney's fees against Plaintiff for the filing of this frivolous lawsuit pursuant to F.S. 57.105 and for any other relief this court deems just and proper.

10.     Plaintiff failed to join an indispensable party, the manufacturer.

11.     Attached as Exhibit "A" is an affidavit from Defendant to verify all the statements made herein.

**WHEREFORE,** Defendants request this Court dismiss the Amended Complaint with prejudice and award Defendants attorney's fees.

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via U.S. Mail to: Anthony Parks, 4459 Sheridan Avenue, Miami Beach, FL 33140, on this _22_ day of _JANUARY_, 2013.

LAW OFFICES OF GRANOFF & KESSLER, P.A.
Attorney for Defendants
8501 S.W. 124th Avenue, Suite 312
Miami, Florida 33183
(305) 596-0200

By: _____
ROY E. GRANOFF, ESQ.
Florida Bar No. 287792

( E x C )

## AFFIDAVIT OF CLIFF LEVIN

STATE OF _COLORADO_____ )
                           ) ss:
COUNTY OF _BOULDER_____ )

       BEFORE ME, the undersigned authority, personally appeared CLIFF LEVIN, who, being by me first duly sworn, deposes and says from personal knowledge:

       1.    I am a defendant in the matter of Anthony Parks v, FIUS and Cliff Levin, Case No.: 08-9236 SP 05. I am also a principal of FIUS, the other defendant in this matter, and am authorized to represent them in this matter.

       2.    The "message from the President" that the Plaintiff attached to the Amended Complaint states that Family Inada transferred its business operations to FIUS Distributors. The message stated that service will be provided through the distributor. As such, FIUS will provide service on INADA products but FIUS did not assume liability for the warranty issues alleged in Plaintiff's Amended Complaint. As such, FIUS should be dismissed as a party of this lawsuit.

       3.    The distributorship was turned over to FIUS and not to Cliff Levin as alleged by Plaintiff. I have never entered into any contract with the Plaintiff. As such, I should be dismissed as a party to this lawsuit.

       4.    There is no contract between FIUS and the Plaintiff. Any contract Plaintiff has is with INADA Family and not FIUS or Cliff Levin. Defendants did not assume the liabilities of INADA Family, only the distributorship of their products.

       5.    No distribution problems were alleged by Plaintiff in his Amended Complaint, as there were no distribution problems. As such, FIUS and Cliff Levin have no liability for any warranty issues involving Mr. Park's claims.

6.      Defendants did not make the chair in question. Defendants did not sell the chair in question to the Plaintiff. Defendants are not responsible for any manufacturing defects in the chair.

7.      INADA made the chair. INADA sold the chair. Any warranty issue Plaintiff has is with INADA.

The foregoing statements are made of my personal knowledge and are true and correct.

CLIFF LEVIN

The foregoing was acknowledged, sworn to and subscribed before me this 8th day of March _____, 2012, by CLIFF LEVIN who is personally known to me or produced CO Drivers License as identification and did take an oath.

Notary Public, State of Colorado

Karen C. Mahon
Print Name

My Commission No.
My Commission Expires: 11/29/13

Exhibit "A"

D

**IN THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR DADE COUNTY, FLORIDA**

| DIVISION | MEMO OF DISPOSITION | CASE NUMBER |
|---|---|---|
| ☑ CIVIL | | 08-009236-SP-05 |
| ☐ OTHER | | Section No.  04 |

| PLAINTIFF(S) | VS. DEFENDANTS(S) | CLOCK IN |
|---|---|---|
| PARKS, ANTHONY | LEVIN, CLIFTON | |
| | FIUS DISTRIBUTORS (L L C) | |
| | NATIONWIDE MUTUAL FIRE INS CO | |

| PLAINTIFF ATTORNEY(S) | DEFENDANT ATTORNEY(S) | DATE OF HEARING | TYPE |
|---|---|---|---|
| | ROY E GRANOFF | 02/14/2014 | 07 |
| | ROY E GRANOFF | 10:15 AM | SPEC APT |
| | | LOC: 05 | |

*see hrg* *expert wit*  *Michelle fragam fees*

**CALENDAR DIRECTIONS**

MOTIONS

TYPE OF MOTION: ___ *Jn fees*      CASE CONTINUED:

COURT RULING ON MOTION:           ☐ PENDING SERVICE         ☐ PENDING SETTLEMENT

☐ GRANTED  ☐ DENIED  ☐ WITHHELD    ☐ SET CASE FOR ___   ESTIMATED TIME REQUIRED ___

COMMENTS: *hrs 24.5 @*          ☐ SPECIAL SETTING INSTRUCTIONS (EXPLAIN)

*expert 3 hrs @ $300 = 9475.00*

**DISPOSITION**

☐ DEFAULT       ☐ FINAL JUDGMENT      ☐ DEFAULT JUDGMENT    ☐ SUMMARY JUDGMENT    ☐ AGREED JUDGMENT

☐ ORDER OF DISMISSAL

   ☐ WITHOUT PREJUDICE   PRINCIPAL $_____   INTEREST $_____

   ☐ WITH PREJUDICE      COURT COSTS$_____  ATTORNEY FEES $_____

☐ ORDER OF TRANSFER TO_____

**CONDITION OF DISPOSITION**

☐ EXECUTION OF JUDGMENT WITHHELD   ☐ ORDER WITHHOLDING JUDGMENT   ☐ PLAINTIFF TO SUBMIT ORDER

PENDING PAYMENT BY DEFENDANT OF THE ABOVE JUDGMENT AT A RATE OF

$_____ PER _____ ,COMMENCING_____
              WEEK/MONTH                    DATE

SWORN TESTIMONY TAKEN IN COURT:

JUDGMENT OR ORDER TO BE PREPARED BY:  ☐ PLAINTIFF  ☐ DEFENDANT  ☐ COURT

☐ DEFENDANT TO FILE ANSWER IN _____ DAYS

☐ A DEFAULT IS HEREBY ENTERED AGAINST _____

FOR FAILURE TO APPEAR AT PRETRIAL AS REQUIRED BY LAW

CLERK OF COURTS          BY:_____      _____
                              DEPUTY CLERK              JUDGE

*2014 FEB 14  PM 12:36   CLERK, CIRCUIT & COUNTY COURTS DADE COUNTY, FLA. CIVIL #115   FILED FOR RECORD*

E

IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CIVIL DIVISION
CASE NO. 08-9236 SP 05 (04)

ANTHONY PARKS,

Plaintiff,

FIUS DISTRIBUTORS, LLC, and
CLIFTON LEVIN,

Defendants.

_____/

## NOTICE OF FILING EXHIBIT

Defendants, FIUS DISTRIBUTORS, LLC, and CLIFTON LEVIN,, file this, their Notice of Filing an additional copy of Exhibits in the above-styled case:

1.      Copy of Safe Harbor Letter and attachments.

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished to Plaintiff via U.S. Mail to: Anthony Parks, 2321 N. Bay Road, Miami Beach, FL 33140, and email to aston771@gmail.com on this 14th day of May, 2020.

LAW OFFICES OF GRANOFF & KESSLER, P.A.
Attorney for Defendants
7990 S.W. 117th Ave., Suite 201
Miami, Florida 33183
(305) 596-0200
Email: roy@gandklaw.com

By: _____/s/ Roy E. Granoff_____
ROY E. GRANOFF, ESQ.
Florida Bar No. 287792

LAW OFFICES OF

# GRANOFF & KESSLER, P.A.

*Professional Arts Center at Kendall Village*
8501 S.W. 124TH AVENUE, SUITE 312
MIAMI, FLORIDA 33183
(305) 596-0200
FAX: (305) 271-8170
email: *granlaw@bellsouth.net*

March 30, 2011

*Via Certified Mail No.: 7010-1870-0000-3085-5855*

Anthony Parks
4459 Sheridan Avenue
Miami Beach, FL 33140

Re: Anthony Parks vs. FIUS Distributors and Clifton Levin
Case No.: 08-9236 SP 05

Dear Mr. Parks:

I have received your Amended Complaint that is totally without merit. I have filed a Motion to dismiss this complaint, copy enclosed.

Pursuant to F.S. 57.105 this letter shall serve as your Safe Harbor Notice. Should you fail to dismiss your complaint within 21 days of receipt of this letter, I will file the appropriate Motion for Attorney's Fees, and will seek recovery of my attorney's fees.

Very truly yours,

Roy E. Granoff, Esq.
REG:mj

cc: Clifton Levin

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete
  item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
  so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
  or on the front if space permits.

1. Article Addressed to:

Anthony Parks
4459 Sheridan Avenue
Miami Beach, FL
              33140

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                    ☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
   A. Parks                        4-4-11

D. Is delivery address different from Item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☒ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)            ☐ Yes

2. Article Number
   (Transfer from service label)

   7010 1060 0000 3089 5855

PS Form 3811, February 2004       Domestic Return Receipt       102595-02-M-1540

DATE PRODUCED                       DRIVER AND MOTOR VEHICLE SERVICES
  05/21/2016

CHARGED TO ACCOUNT NO: PREPAID                    INTERNAL USE ONLY: 69721
VR 5  LAST PROCESS DATE  09/23/14

PLATE/FILE NO   EXPIRATION   TITLE NUMBER  YEAR  MAKE  STYLE   I.D. NUMBER
013GNK          09/28/16     0821274849    2008  MERZ  CN      WDBWK56F48F173119
                             HVY VEH: N  4YR: N


REGISTERED OWNER NAME & ADDRESS                       DOB       ODL/CUSTOMER NO

        PARKS, ANTHONY E                          09/30/55   1745275
  ADD 8726 SE 9TH AVE              PTLD
      3376 NE SANDY BLVD
      PORTLAND        OR        97232




SECURITY INTEREST HOLDER NAME & ADDRESS                       ODL/CUSTOMER NO

        PARKS, JOEL                               06/26/26   2148216
        2 WYNDOVER WDS BUILD Z APT 2
        WHITE PLAINS      NY        10603



                                              ODOMETER READING:      65

                                              DATE OF READING: 09/17/07


I, THE UNDERSIGNED, BEING DULY APPOINTED AND HAVING WITHIN MY CUSTODY THE RECORDS
OF DRIVER AND MOTOR VEHICLE SERVICES, DEPARTMENT OF TRANSPORTATION, STATE OF OREGON,
HEREBY CERTIFY THAT THE FOREGOING VEHICLE RECORD COPY IS A CORRECT TRANSCRIPT OF THE
SPECIFIED DATA CONTAINED WITHIN THE DATA PROCESSING DEVICE OR COMPUTER.

SIGNED UNDER THE SEAL OF THE DEPARTMENT THIS 21ST DAY OF MAY,      2016.

                              MANAGER, CUSTOMER SERVICES

                              Lana Stibley

MAIL TO:

        ANTHONY PARKS
        PLEASE FAX TO:
        305-602-4572



**H**



8054147

| | | | | |
|---|---|---|---|---|
| 831C68 | 0602327601 | 012306 | N/A | |
| 1994 | LEXS | UT | LAS | JT6HJ88J9T0137146 |

PARKS, ANTHONY E
NORTHWEST LANDING DEVELOPMENT INC
PARKS, JOEL E
8726 SE 9TH AVE
4750 S OCEAN BLVD # 210
HIGHLAND BEACH FL 33482

PTLD

TITLE BRANDS

✓ - NONE -

J C P FIN
2 WYNDOVER WDS BLD 2 STE 2
WHITE PLAINS NY 10603

A31C68 JT6HJ88J9T0137146 0602327601 C
2872 011 11 91 TX 02 57 M1 95 60 M3 26

OREGON

PASSENGER REGISTRATION

| | | | | |
|---|---|---|---|---|
| A31C68 | 0602327601 | 012306 | JAN 13, 98 | GASOLINE |
| 1994 | LEXS | UT | LAS | JT6HJ88J9T0137146 |

PARKS, ANTHONY E
NORTHWEST LANDING DEVELOPMENT INC
PARKS, JOEL E
8726 SE 9TH AVE
4750 S OCEAN BLVD # 210
HIGHLAND BEACH FL 33482

PTLD

MULTNOMAH

# Driver and Motor Vehicle Services

## OREGON DEPARTMENT OF TRANSPORTATION

As an authorized officer or employee of Driver and Motor Vehicle Services (DMV), I hereby certify that I have compared the copy printed above, or to which this certificate is affixed, with the original on file in the records of the agency and that it is a true and correct copy of the original.

*EXECUTED UNDER THE SEAL OF OREGON DRIVER AND MOTOR VEHICLES SERVICES*

DATE: 06-22-18

SIGNED: [signature]

J

FILED: WESTCHESTER COUNTY CLERK 01/07/2020 02:23 PM

NYSCEF DOC. NO. 14

INDEX NO. 61292/2019

RECEIVED NYSCEF: 01/07/2020

At IAS Parts ( ) Of the Supreme Court
Of the State of New York, held in and
For the County of Westchester Courthouse,
111 Dr. Martin Luther King
White Plains, New York
The 27th day of December 2019

Supreme Court of The State of New York
Westchester County

The Estate of Joel E. Parks
        Petitioner

Vs.

Index No.61292/2019

Westchester County
        Respondent One

Paradise Auto Brokers, Inc.
        Respondent Two

Marks Towing, Inc.
        Respondent Three

ORDER GRANTING PETITIONERS MOTION
FOR DEFAULT
AND
FINAL JUDGMENT
AND
GRANTING ORDER FOR SHERIFF TO SEIZE
THE SUBJECT VEHICLE

1. This case came before the court on Petitioners motion for default and final judgment,

on petitioner's behalf which came before the court on December 17, 2019:

1 of 4

FILED: WESTCHESTER COUNTY CLERK 01/07/2020 02:23 PM          INDEX NO. 61292/2019
NYSCEF DOC. NO. 14                                            RECEIVED NYSCEF: 01/07/2020

FINDINGS:

6.   The court finds that since the defendants have not tendered any type of defenses or

Any support to their claims that there is none, further it is the courts finding that when

Plaintiff ordered the repossession of the subject vehicle it was within their legal right to do so

By which respondent Paradise has chosen not to challenge.

therefore:

**ORDERED** that Default and Final Judgment be entered against the defendants Westchester

County, Paradise Auto Brokers, Inc. and Marks Towing, Inc.

It is further **ORDERED** that the Westchester County Police (sheriffs unit) seize the subject

Vehicle from:

Mark's Towing, Inc.
30 Claremont Ave,
Thornwood, N.Y. 10594

or any other address the subject vehicle maybe, within Westchester County, also the Sheriff

may break and enter any other premises that the subject vehicle maybe within

Westchester County and deliver said vehicle to Plaintiff (or his agents)

forthwith. The Surety Bond posted by plaintiff be fully discharged.

The Court shall retain jurisdiction to enforce this order.

So, **ORDERED** in Chambers on this 20th day of December 2019.

Honorable Sam D. Walker

3

H

IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ANTHONY PARKS,

      Plaintiff,

vs.

FIUS DISTRIBUTORS, LLC.,
CLIFTON LEVIN, individually,

      Defendants.

_____/

CIVIL DIVISION
CASE NO. 2008-9236 SP 05 (04)

**AMENDED**
**FINAL JUDGMENT FOR DEFENDANTS**

      After a review of the record and being fully advised it is **ORDERED AND ADJUDGED**

**THAT**: The Court entered an Order on January 14, 2019 (Order on Attorney's Fees and Costs)

that determined that the Defendants shall recover from the Plaintiff, ANTHONY PARKS,

additional attorney's fees in the amount of $23,905.00 and additional costs in the amount of

$12,415.81. The amount of fees and costs (the total of which are contained in the 1/14/2019

order on fees and costs) are in addition to the Final Judgment entered on February 14, 2014

against the Plaintiff and in favor of the Defendants in the amount of $9,475.00, for a TOTAL

amount of **$45,795.81.** The original amount of $9,475.00 shall bear interest at the statutory from

February 14, 2014 and the additional amount of $36,320.81 shall bear interest at the statutory

from the date of this Judgment, for which total of $45,795.81 execution shall issue forthwith.

      DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 01/14/19.

_____
ALEXANDER S. BOKOR
COUNTY COURT JUDGE

```
FINAL ORDERS AS TO ALL PARTIES
SRS DISPOSITION NUMBER   12
THE COURT DISMISSES THIS CASE AGAINST
ANY PARTY NOT LISTED IN THIS FINAL ORDER
OR PREVIOUS ORDER(S). THIS CASE IS CLOSED
AS TO ALL PARTIES.
              Judge's Initials   ASB
```

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

Copies Furnished to:
Roy E. Granoff, Esq., roy@gandklaw.com, and irene@gandklaw.com
Anthony Parks, Pro-se, 2321 N. Bay Road, Miami Beach, FL 33140, and aston771@gmail.com

IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ANTHONY PARKS,

        Plaintiff,

vs.

FIUS DISTRIBUTORS, LLC.,
CLIFTON LEVIN, individually,

        Defendants.
_____/

CIVIL DIVISION
CASE NO. 2008-9236 SP 05 (04)

**AMENDED**
**FINAL JUDGMENT FOR DEFENDANTS**

        After a review of the record and being fully advised it is **ORDERED AND ADJUDGED THAT**: The Court entered an Order on January 14, 2019 (Order on Attorney's Fees and Costs) that determined that the Defendants shall recover from the Plaintiff, ANTHONY PARKS, additional attorney's fees in the amount of $23,905.00 and additional costs in the amount of $12,415.81.  The amount of fees and costs (the total of which are contained in the 1/14/2019 order on fees and costs) are in addition to the Final Judgment entered on February 14, 2014 against the Plaintiff and in favor of the Defendants in the amount of $9,475.00, for a TOTAL amount of **$45,795.81.**  The original amount of $9,475.00 shall bear interest at the statutory from February 14, 2014 and the additional amount of $36,320.81 shall bear interest at the statutory from the date of this Judgment, for which total of $45,795.81 execution shall issue forthwith.

        DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 01/14/19.

_____
ALEXANDER S. BOKOR
COUNTY COURT JUDGE

Case 1:24-cv-23692-KMW   Document 1   Entered on FLSD Docket 09/18/2024   Page 36 of 84

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: <u>2018-041935-CA-01</u>
SECTION: <u>CA06</u>
JUDGE: <u>Charles Johnson</u>

**Anthony Parks**
Plaintiff(s)

vs.

**Fius Distributors LLC et al**
Defendant(s)

_____/

## ORDER ON AMENDED MOTION FOR COURT TO DETERMINE AMOUNT OF ATTORNEY'S FEES

**THIS CAUSE**, having come on to be heard on the 10th day of January, 2022, and the Court having heard the testimony of Roy Granoff, Esq. and expert witness Sean O'Connor, Esq., and argument of counsel and of Plaintiff, pro se, and being otherwise fully advised in the premises, it is hereupon, found:

    1.   the invoice presented by attorney Granoff was admitted into evidence; that the Plaintiff questioned the charge on July 16, 2021 for a telephone call for .2 of an hour for the amount of $70.00. This charge is removed from the bill. The remaining charges are found to be valid and reasonable.

    2.   The court finds that Roy Granoff, Esq. has been an attorney for 42 years and his rate of $350 per hour is reasonable given the nature of the litigation, his experience and the going rate in the community; and that the reasonable number of hours expended on the case are found to be 10.5 hours. The amount of attorney's fees awarded is $3,501.00.

    3.   The expert witness, Sean O'Connor is found to be qualified as an expert witness and his rate of $400.00 per hour is reasonable given his 18 years of experience, and the going rate in the community. The court finds that five (5) hours are reasonable for the time he expended in this cause. Accordingly $2,000.00 is awarded for expert witness fees.

**ORDERED AND ADJUDGED** that the total amount of attorney's fees awarded is $5,501.00 and a Final Judgment shall be entered for that amount.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>13th day of January, 2022</u>.

<u>2018-041935-CA-01 01-13-2022 1:13 PM</u>
Hon. Charles Johnson

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Roy E Granoff, roy@gandklaw.com
Roy E Granoff, asst@gandklaw.com
Roy E Granoff, clerk@gandklaw.com
anthony parks, westwoodentertainmentllc@gmail.com
anthony parks, aston771@gmail.com
anthony parks, aston771@gmail.com

**Physically Served:**

M

*[Exhibit D]*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FAMILY INADA Co., Ltd.,                    :
                                           :
                                           :
                                           :
                          Plaintiff,       :
                                           :
                                           :      Civil Action No. 19-925-CFC
                                           :
                    v.                     :
                                           :
FIUS DISTRIBUTORS LLC, D.B.A INADA         :
USA, D.B.A. FURNITURE FOR LIFE             :
                                           :
                                           :
                          Defendant.       :
                                           :

---

Daniel M. Silver, MCCARTER & ENGLISH, LLP, Wilmington, Delaware; Keith Toms, MCARTER & ENGLISH, LLP, Boston, Massachusetts; Aya Cieslak-Tochigi, MCARTER & ENGLISH, LLP, New York, New York

*Counsel for Plaintiff*

Robert A. Penza, POLSINELLI PC, Wilmington, Delaware; Christina B. Vavala, POLSINELLI PC, Wilmington, Delaware; John R. Posthumus, POLSINELLI PC, Denver, Colorado

*Counsel for Defendant*

## **MEMORANDUM OPINION**

October 18, 2019
Wilmington, Delaware

COLM F. CONNOLLY,
UNITED STATES DISTRICT JUDGE

Before me is Plaintiff Family Inada Co., Ltd.'s motion for a preliminary

injunction. Family Inada seeks to enjoin Defendant FIUS Distributors LLC from

using the DREAMWAVE trademark, ✎ logo, DREAMWAVE.com webpage

and domain name, and related marks (collectively, the "DREAMWAVE mark") to

sell massage chairs. Family Inada and FIUS each claim ownership of the

DREAMWAVE mark.

The parties agree that *Covertech Fabricating, Inc. v. TVM Building*

*Products, Inc.*, 855 F.3d 163 (3d Cir. 2017) provides the correct legal rule for

deciding who owns the DREAMWAVE mark. Applying the *Covertech* test to the

facts adduced at a preliminary injunction hearing held on October 1, 2019, I find

that Family Inada has a reasonable probability of succeeding in proving at trial that

it owns the DREAMWAVE mark. I also find that Family Inada will suffer

irreparable harm if it is not granted a preliminary injunction. Finally, I find, and

FIUS does not dispute, that the equitable and public policy factors courts consider

when deciding the merits of a preliminary injunction motion weigh in Family

Inada's favor. Accordingly, I will grant Family Inada's motion for a preliminary

injunction.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE



| | |
|---|---|
| FAMILY INADA Co., Ltd. | Civil Action No. |
| Plaintiff, | **DECLARATION OF**<br>**MASARU HANADA** |
| v. | |
| FIUS DISTRIBUTORS LLC, D.B.A. INADA USA, D.B.A. FURNITURE FOR LIFE, | PUBLIC VERSION FILED: June 11, 2019 |
| Defendant. | |

I, Masaru Hanada, declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am Assistant Manager of Family Inada Co., Ltd. ("Family Inada"). I make this Declaration in support of Family Inada's Motion for Preliminary Injunction.

2.      I have personal knowledge of the facts set forth in this Declaration, or my knowledge is based on a review of the business records of Family Inada, and I would testify to them in a court of law if required to do so.

3.      I have held been employed by Family Inada since 2004, and have been Assistant Manager since 2018. In connection with my role as Assistant Manager, I have responsibility for overseeing businesses conducted by Family Inada globally, including in the United States.

4.      In my role as Assistant manager, I am familiar not only with Family Inada business, but also with product research and development, design, refinement, testing, advertisement and marketing, and distribution channels of the products on a global basis. Further, in order to perform my role, I am necessarily familiar with the range of products and services offered under the Family Inada's various brands, with the channels of trade through which those products and services are and have been advertised, offered, and sold, as well as

ME1 30267783v.1

10.     In the United States, it owns incontestable U.S. Trademark registration No.

4,252,717 for **INADA** and U.S. Trademark registration No. 3,882,670 for , and U.S.

Trademark Registration No. 4,638,977 for **FAMILY INADA**, which are all for use in connection

with "massage apparatus" among other goods (collectively the INADA Housemark). *See* Ex. 1.

11.     Due to Family Inada's storied history of literally creating the massage chair

industry, and its sterling reputation for leading innovation ever since, the INADA house mark is

synonymous with "legendary quality" quality and industry leadership.   The legendary Inada

quality control is regularly marketed to U.S. consumers. *See, e.g.*, Ex. 2.

12.     INADA branded products are regularly marketed as The World's Best Massage

Chair®.

13.     While Family Inada had been selling INADA branded massage chairs in the

United States for some time, in 2007 it partnered with Mr. Clifford Levin to further grow the

INADA brand in the United States.

14.

15.

16.     Mr. Levin requested that FIUS be permitted to do business under the INADA

Housemark to leverage Inada's tremendous reputation in the massage chair industry.   Family

Inada agreed, and gave FIUS license to make broad use of the INADA Housemark and do

business as "Inada USA."   Family Inada saw this as a way to grow the INADA brand in the

3

MEI 30267783v.1

with the consumers to whom Family Inada advertises, markets, and sells those products and services.

5.  In addition, and as a result of the fact that I have been employed by Family Inada since 2004, I am familiar with the corporate history of Family Inada, the company's business records as referenced herein, with its business generally, and with the company's sales.

6.  In preparing this Declaration, I have reviewed Family Inada's documents and records as referenced herein. The documents and records I refer to herein are (i) documents and records that Family Inada relies upon in conducting its business; and (ii) documents generated by third parties that relate to the business of Family Inada. I have confirmed that the Family Inada documents and records are the types of documents upon which I regularly rely in connection with my role as Assistant Manager for Family Inada, and I have verified their accuracy. For the third party documents, I am family with the information relied upon for the statements made therein as a result of my duties for Family Inada. In addition, I can confirm their accuracy as they relate to the business of Family Inada based on the corporate and business records, of which I am familiar as part of my role as Assistant Manager.

## I.    HISTORY OF FAMILY INADA

7.  Founded in 1962 by Mr. Nichimu Inada, Family Inada has been a world leader in the field of massage chairs for over 50 years.

8.  Indeed, Mr. Inada has the honor of inventing the first automatic shiatsu massage chair out of his workshop in Osaka Japan, and ever since has made it his mission to bring the health benefits of massage chairs to customers around the world.

9.  Family Inada does business around the world under the housemark INADA.

United States, and the Inada USA name gave FIUS instant credibility in the massage chair industry. FIUS has been doing business under the INADA Housemark since at least as early as 2009.

17.     FIUS would eventually register the domain name InadaUSA.com, where it used the INADA house mark to distribute Family Inada chairs. Samples over time of this website, which are gathered from Archive.org, are attached as Ex. 4.

18.     The parties, however, did not enter into a formal licensing agreement, and ████

████████████████████████████████████████

19.     In the relationship, Family Inada entirely controlled the nature of the products, the design of new products, product quality, and product manufacture. Family Inada also had the final say on branding, although it reasonably considered the advice of FIUS, which it partnered with precisely because of Mr. Levin's understanding of the U.S. furniture marketplace.

20.     FIUS understood that Family Inada was the owner of the INADA Housemark and that it was operating with Family Inada's permission to use the Inada USA mark. Family Inada exercised control over FIUS' use of INADA Housemark by controlling the nature of the products FIUS sold. FIUS acceded to Family Inada's requirements and standards with respect to the use of the INADA Housemark.

21.     Family Inada would wholesale its INADA massage chairs to FIUS, who would then either sell them to dealers (such as furniture stores) or end consumers under the INADA Housemark.

22.     As part of this deal, it was FIUS' responsibility to market and advertise INADA massage chairs, provide customer service, and administer the warranty for the products in the

4

United States. All of these activities, however, have been carried out under the INADA house mark and the "Inada USA" trade name. Consumers associate both the goods and services with Family Inada.

23. The warranty page of the InadaUSA.com website states "[a]t Inada, we are committed to delivering the best massage chair experience money can buy. As part of this commitment, we provide buyers with the industry's finest and most comprehensive massage chair warranty available." *See* Ex. 4, pg. 78. Consumers reading this understand that Inada is stands behind its chairs.

24. Indeed, FIUS' offices and flagship showroom were even branded with the INADA Housemark, and FIUS employees — including Mr. Levin — regularly wore shirts and nametags that featured the INADA Housemark:



Ex. 6, Visit to Inada USA Headquarters (May 30, 2014) (screen capture).

5



Ex. 7, CES 2013 Interview with Inada USA's CEO, Cliff Levin (Jan 11, 2013) (screen capture).

## II.   THE INADA DREAMWAVE CHAIR

25.   After nearly a decade of painstaking research and development, design, refinement, and testing, in 2007 Family Inada was set to unveil its newest flagship, ultra-luxury massage chair under the brand name SOGNO, which means "dream" in Italian.   INADA SOGNO chair was engineered by Family Inada, and its aesthetic design was created by famed Japanese designer Toshiyuki Kita.

26.   The SOGNO massage chair was equipped with innovative proprietary functions previously unknown to the massage chair industry.   One such function included moving the seat in a pattern of a figure 8 to create the sensation of being rocked by a gentle undulating wave. This innovative function quickly became one of the most popular functions among the users.

6

27.     Family Inada demonstrated its new massage chair to its U.S. partner, Mr. Levin. When Mr. Levin experienced this wonderful new chair, he proposed that Family Inada call its innovative features the "DreamWave Technology."

28.     Reflecting the popularity of the "DreamWave" technology, in or about February 2008, Inada further decided to brand the model itself the INADA SOGNO DREAMWAVE and created the **sogno** DreamWave logo that Family Inada affixed to the INADA SOGNO DREAMWAVE chairs' shipping cartons and the product manual. *See* Ex. 8. Exhibit 8 shows the design of the shipping cartons used in the United States, both for the design of the FAMILY INADA housemark and the current design, as well as the product manual used in the United States.

29.     Each INADA SOGNO DREAMWAVE chair was marked by Family Inada with the INADA Housemark and the INADA SOGNO DREAMWAVE Mark. A representative image of a label affixed to the chair is below:



30.     In the United States, FIUS promoted INADA SOGNO DREAMWAVE chair as a Family Inada chair, touting its "Proprietary Inada DreamWave Technology." For example:

7



*See* Ex. 4, pg. 3, InadaUSA.com (April 17, 2010 Archive.org capture) (emphasis added).

31. The INADA SOGNO DREAMWAVE chair was featured at the Consumer Electronics Show ("CES") in 2009, where it generated a great deal of attention on the show floor for its innovative design and cutting edge technology. It would also be honored with an Innovation Award by the show's organizers. Thereafter, the INADA SOGNO DREAMWAVE chair quickly became Inada's top selling model in the United States, and one of the most revered and esteemed massage chairs on the market.

32. At CES 2009, Mr. Levin gave an interview as the "president of the U.S. division for Inada Massage Chairs" where he discussed the Inada Sogno chair and stated "the Inada Sogno offers something we call DreamWave Technology." *See* Ex. 9, Transcript at pg. 2, 1:37-1:42.

33. In or around September 2013, when Family Inada was contemplating an updated version of its SOGNO DREAMWAVE chair, FIUS proposed that challenges in pronouncing the SOGNO name may be holding this product back and suggested shortening the name to INADA DREAMWAVE. Family Inada took this recommendation under advisement and ultimately agreed, shortening the name to INADA DREAMWAVE.

8

34.     Family Inada and its licensee FIUS also worked together to create a three-line

design mark, , which would be affixed to each INADA DREAMWAVE chair that Inada

manufactured.  While FIUS proposed the initial design, it was unacceptable to Family Inada's

designer, and thus Family Inada modified the design to the form that was adopted.

35.     Family Inada first affixed the INADA DREAMWAVE mark and the logo to

Family Inada manufactured chairs in 2014.  Each INADA DREAMWAVE chair included,

among others, a label that featured the INADA Housemark and INADA DREAMWAVE marks,

for example:



36.     Without Family Inada's knowledge, FIUS acquired the domain name

DreamWave.com, to which it eventually redirected traffic from InadaUSA.com.  From

approximately 2017 through the end of 2018, FIUS branded the DreamWave.com website with

the INADA Housemark and used this website to exclusively sell the full line of Inada chairs.

37.     Tellingly, throughout the history of the chair, both Family Inada and FIUS

understood the DREAMWAVE mark to be a technology mark and a model designation of an

INADA chair, and it was clearly marketed as such.  The INADA branded dreamwave.com

website, which FIUS used exclusively to sell and market Inada chairs, makes this fact abundantly

clear:

9



Ex. 10.  When one scrolled over the "Models" category on the INADA branded website, the first item was the DREAMWAVE chair.

38.     The product page for the INADA DREAMWAVE model also refers to it as the "Inada DreamWave Massage Chair" and states that "[a]ll of Inada's industry leadership and innovation has been leading to this. Introducing the DreamWave® by Inada, culminating years of research, testing, and uncompromising attention to detail and design." *Id.* at 4.

39.     Then, after touting the benefits and technology of the Inada DreamWave chair, the website states "[i]t's all part of what makes Inada the World's Best Massage Chair®." *Id.* at 5.

40.     Likewise, the operating manual for these products made abundantly clear that the DREAMWAVE is a model of Family Inada chair:

10



*See* Ex. 11, Operating Manual (red annotations added).

41. For over ten years, FIUS sold INADA SOGNO DREAMWAVE and INADA DREAMWAVE branded chairs under the Inada USA trade name in the United States as the sole distributor of these goods, marketing this products under the INADA Housemark.

42. Consumers encountering the marketing materials understood that DREAMWAVE was a model of INADA chair, which was the intended result.

43. In a video posted online, a dealer interviewing Mr. Hays, FIUS' Vice President of Sales, states "a lot of you are probably familiar with the word DreamWave. DreamWave has traditionally been associated with the Inada DreamWave massage chair..." Ex. 12, Transcript, 1:11–13 (Transcript of Interview; emphasis added). Family Inada agrees with this assessment that DreamWave is associated with Inada DreamWave massage chair.

44. In the same interview, Mr. Hays refers to the INADA DREAMWAVE chair as the "DreamWave Classic" and calls it "an iconic massage chair in the premium massage chair category, something certainly that is recognized." *Id.* at 2:4-6. Family Inada agrees that the INADA DREAMWAVE is an iconic massage chair and that the industry and consumers recognize its iconic status.

11

ME1 30267783v.1

45.     In 2014 FIUS and Family Inada discussed applying to register the trademark DREAMWAVE.  Family Inada believed that this brand was reasonably protected by its use-based rights arising out of the mark's long use and the strong industry association with the INADA Housemark, and thus did not believe registration to be necessary.  Family Inada, however, would have considered filing a U.S. application if FIUS reimbursed it for the expenses. Family Inada believed that FIUS agreed with its decision, as there were no further discussions about registering this mark.  Family Inada was unaware that FIUS filed a DREAMWAVE application in 2014, let alone that it was in FIUS' name.

46.     On or about January 30, 2014, FIUS, without knowledge or authorization of Family Inada, submitted or caused its attorney to submit to the United States Patent and Trademark Office the specimen below to register the DREAMWAVE mark:

12



*See* Ex. 13 (annotation added). This is the INADA DREAMWAVE chair.

47. Family Inada continues to use the DREAMWAVE mark and has never assigned the mark to any third party, including FIUS.

## III. FIUS' LAUNCH OF A COMPETING, INFRINGING ENTERPRISE UNDER DREAMWAVE BRAND

48. When I arrived at CES in January 2019, I was surprised to see that FIUS was operating a large DREAMWAVE branded booth, as Family Inada had heard of no such plans. When I investigated further, I found that this booth was not selling INADA chairs.

49. Instead, it quickly became apparent that FIUS was using Inada's DREAMWAVE brand to launch a competing business enterprise, which aimed to hijack Family Inada's valuable goodwill and unfairly trade on the reputation and iconic status of the INADA DREAMWAVE

13

chair. Pictures I took of the infringing booth and products are attached as Exhibit 14. Each chair features both the DREAMWAVE mark and the ✎ logo.

50.    I have reviewed an interview given by Mr. Levin at CES 2019, where I understand that he claims to have been working for years on designing a competing, Chinese manufactured massage chair in secret. Ex. 15, Transcript, pg. 1:9-11, 16-21.

51.    FIUS did not tell Family Inada of its plans to launch a competing business under the DREAMWAVE mark, despite the fact that Family Inada is the second largest shareholder of FIUS. Family Inada had no knowledge of these plans until I discovered the DREAMWAVE booth at CES in 2019.

52.    Family Inada also discovered while I was at the CES 2019 show that FIUS also changed the www.dreamwave.com website — which it had used for years to sell the full line of INADA branded chairs — to sell the infringing chairs. Notably, it did nothing to dispel the longstanding association between this website and Inada, and instead touted its new chair's alleged Japanese design and engineering. Ex. 16 (dreamwave.com accessed on January 10, 2019).

53.    Moreover, during CES 2019, FIUS was actively misdirecting consumers from the Inadausa.com website. In particular, the "Why Choose DreamWave" page of store.inadausa.com, which touts Inada's 50 year history of setting the standard for luxury massage chairs, stated "for more information on DreamWave massage chairs and the features that make them the best in the world, visit us at www.dreamwave.com." *See* Ex. 17, Store.Inadausa.com (Jan. 10, 2019). When customers clicked on the link, however, they were directed to the FIUS website selling the infringing chairs. *See* Ex. 17.

14

54.      I also witnessed actual confusion at CES 2019.  Furniture dealers and customers approached me to inquire after the "new" DREAMWAVE chair, believing that it was an Inada product.  While knowing that I was a representative of Family Inada, several show attendees asked me about the DREAMWAVE booth.  For example, one attendee asked me if the chairs at the DREAMWAVE booth were Inada chairs, and another attendee wanted to know why there were no other models of INADA chairs at the booth.

55.      In an interview conducted at CES with Mr. Levin, which was posted online, a dealer stated "can you talk about the DreamWave name, I know there is some confusion whether it's an Inada chair, or whether it's made by Inada, or how the DreamWave name came to be...." *See* Ex. 15, Transc., p. 2:19-21.  This is consistent with the actual confusion I witnessed at the CES show.  I also note that, in the interview, Mr. Levin does not say that Family Inada was not involved in the design and manufacture of the new chair, and instead refers to Inada as "our manufacturer." *Id.*, Transc., pp. 2:22-3, 3:2.

56.      Since CES, Family Inada has learned that FIUS has taken further steps to misappropriate Family Inada's goodwill and cachet in the DREAMWAVE trademark.  This includes rebranding the INADA DREAMWAVE chair as the DREAMWAVE CLASSIC, and selling it next to the "new DreamWave" and as part of the DREAMWAVE "category."  Ex. 18. It is clear that FIUS purpose and intent of this action is to take Family Inada's good will in its iconic DREAMWAVE massage chair for the benefit of its new chair that is directly competing with Family Inada.

57.      FIUS has intentionally removed the INADA branding from the marketing and promotional materials for the purported DREAMWAVE CLASSIC.  FIUS is misrepresenting the

15

origin of these chairs to cause consumers to believe that they originate with FIUS, not Family Inada.

58. In interviews, FIUS' Vice President of sales explicitly trades on Inada's reputation to target Family Inada's "loyal followers":

> "Of course, the DreamWave Classic [i.e., the INADA DREAMWAVE] that you alluded to earlier has been in the market for 10 years and really we believe *is an iconic massage chair* in the premium massage chair category, *something certainly that is recognized*. So for those *loyal followers* or those people that have owned DreamWave in the past, this is something that's *been long awaited, the release of a new DreamWave*."

Ex. 12, Hays Interview Trans. pg. 2, ll. 3- 7 (emphasis added).

59. Notably, the interviewer indicates his actual confusion when discussing warranty repairs by stating that "Inada's fantastic that way" and attributing the lack of customer complaints in part to the fact that "the product is that good and doesn't have a high failure rate." *See id.* at p. 6:15–9. This is true of INADA chairs, but totally unknown with respect to the FIUS' Chinese manufactured chairs.

60. FIUS is also engaged in bait-and-switch tactics on the internet. A Google search for "DreamWave chair" returns numerous references to Inada and the INADA DREAMWAVE, including:

Inada DreamWave chair
https://www.dreamwavechair.com/ ▾
The Inada DreamWave chair combines Shiatsu master massage movements with Japanese engineering ingenuity for a full-body massage proven to enhance
DreamWave · Contact Us · About Us

*See* Ex. 19. When consumers click this link, however, they are taken to the infringing dreamwave.com website.

61. Moreover, FIUS has further blurred the lines between its new competing business and Family Inada to further confuse consumers and trade on Family Inada's goodwill. This

16

includes claiming Furniture for Life is the "parent company" of Inada USA — it's not. It is merely another D/B/A for FIUS.

62.     It also inexplicably claims that "Inada is a registered trademark of Furniture for Life," which is also clearly false:



Copyright © 2019 Furniture For Life  All rights are reserved
Inada is a registered trademark of Furniture For Life
Furniture For Life  Boulder, Colorado 303-572-5000 | Privacy Policy

Ex. 20 (screen capture from inadausa.com).

63.     Family Inada has been told that FIUS is spreading rumors that Family Inada is closing its doors and is in the process of going bankrupt. This is false and intended to further unfairly compete with Family Inada.

64.     Family Inada objected to FIUS' infringement of the DREAMWAVE Trademarks immediately in a demand letter sent on January 10, 2019, two days after the CES show started, indicating that that its use of the DREAMWAVE mark on non-Inada manufactured chairs was unauthorized, beyond the scope of the license to use the DREAMWAVE trademark, and a trademark infringement. FIUS did not cease its infringement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Osaka, Japan, this 13th day of May.

MEI 30267783v.1

Masaru Hanada

18

## I.     BACKGROUND

Family Inada, founded and headed by its president, Nichimu Inada, is a Japanese company that manufactures high-end massage chairs for sale in numerous countries, including the United States.  FIUS was Family Inada's exclusive distributor of chairs in the United States from 2008 to 2018.  Preliminary Injunction Hrg. Tr. at 115–16 (October 1, 2019).   From its inception, FIUS presented itself as an extension of Family Inada.  Tr. at 127–28.  The acronym FIUS stands for "Family Inada United States," and FIUS often did business under the name Inada or Inada USA.  Tr. at 33, 127–28.  For a time FIUS even had an "Inada" sign on the front of its building.  Tr. at 142.  For its part, Family Inada was more than happy to allow FIUS to use Family Inada's name and iconography, because Family Inada believed "FIUS was a great partner . . . [and] one that was very trustworthy."  Tr. at 33.  The trust Family Inada and FIUS had in each other was sufficiently great that the parties operated without a written agreement to govern their relationship.  *See* tr. at 183.

In 2007 Family Inada began to sell the "SOGNO" massage chair in Japan. Tr. at 31.  The following year, Family Inada worked with FIUS to bring the SOGNO chair to the United States.  Tr. at 31.  At FIUS's suggestion, Family Inada marked the SOGNO chairs that were distributed in the United States as "the SOGNO DREAMWAVE."  Tr. 31-32.  "Sogno" is Italian for "dream" and the

chair had a wave-like movement setting.  Tr. at 31–32.  FIUS's CEO Clifford

Levin believed—and persuaded Family Inada—that "DREAMWAVE" would

resonate with American consumers much better than "SOGNO" would.  Tr. at 41.

    In late 2013, Family Inada, with input from FIUS, began to develop a

"DREAMWAVE 2.0" chair.  Tr. at 106.  When Family Inada launched the

new-and-improved chair in 2014, it dispensed with "SOGNO" and marked the

chairs "DREAMWAVE."  Tr. at 106.

    Just before the launch of the DREAMWAVE 2.0, Levin and Inada met in

Japan.  Tr. at 160, 173–74.  Levin suggested at the meeting that someone should

register the DREAMWAVE mark in the United States.  Tr. at 160.  Inada believed

that the DREAMWAVE mark belonged to Family Inada "as a matter of course," as

Family Inada had, as of 2013, been making chairs with the DREAMWAVE mark

for five years for distribution in the United States and other countries.  D.I. 45, ¶4.

He therefore expressed no interest in seeking formal registration of the mark in the

United States.  Tr. at 161.  Levin was "shocked" by Inada's seeming lack of

interest, tr. at 161, and decided that he would have FIUS apply for registration of

the DREAMWAVE mark with the United States Patent & Trademark Office

(USPTO).  Without telling Family Inada, FIUS filed for and obtained in 2014

registration of the mark from the USPTO.  Tr. at 162; D.I. 31-1, Ex. 1.

In 2015, Family Inada's legal department learned that FIUS had registered the DREAMWAVE mark with the USPTO. Tr. at 79. In 2016, Family Inada sent to all its distributors, including FIUS, an "Agreement of Intellectual Property Rights." D.I. 31-1, Ex. 2; D.I. 44, ¶ 5. The agreement provided that "[w]ith regard to a mark that is marked onto [a] product made or developed by [Family Inada], Distributor may file the trademark application or may register the trademark thereof . . . at its costs and expenses." D.I. 31-1, Ex. 2 at 1–2. The agreement obligated the Distributor to assign to Family Inada upon termination of the Distributor's relationship with Family Inada, any trademark filed or registered by the Distributor pursuant to the agreement. *Id.* at 2. With respect to trademarks already registered by the Distributor, the agreement provided that the "detailed items and conditions for the license [of such marks] shall be separately discussed and determined between the parties hereto." *Id.*

Levin received the Agreement of Intellectual Property Rights by email in January 2016 from Masura Hanada, an Assistant Manager with Family Inada. D.I. 31-1, Ex. 3 at 4–5. Hanada reported directly to Inada and was responsible for Family Inada's dealings with its distributors throughout the world. Tr. 29.

Rather than reply to Hanada's email, Levin forwarded it to Masaki Kagano, a consultant employed at the time by Family Inada to act as "an intermediary," translator, and interpreter, in Family Inada's dealings with FIUS. Tr. at 86. In

4

truth, Kagano acted as FIUS's double agent, not Family Inada's intermediary.

Unbeknownst to Family Inada, FIUS paid Kagano $60,000 in 2015, $60,000 in

2016, and $200,000 in 2017, tr. 162; and it is clear from Kagano's written

communications with Levin that the two men had been plotting before 2016 to start

their own "new business" that would "still remind consumers [and the] market" of

"what [FIUS had] built with INADA." D.I. 31-1, Ex. 3 at 2.

In the email forwarding Hanada's January 2016 email to Kagano, Levin

wrote that the Agreement of Intellectual Property Rights "present[ed] some issues

because we have in fact registered" three marks, including the DREAMWAVE

mark. D.I. 31-1, Ex. 3 at 2. Levin stated that his "simple preference is to not sign

this, but my guess is that this is not a possible position for us to take." *Id.* Levin

noted further that "it is so so strange to me that [Family Inada] ask[s] for this now.

It's only 6-10 years too late :-) Just kind of funny actually what seems to suddenly

matter to Family." *Id.*

In his reply email to Levin, Kagano explained that a recent trademark

dispute with Family Inada's distributor in China was the reason why Family Inada

had "start[ed] claiming [sic] for this [agreement] now." *Id.* at 1.[1] Kagano told

---

[1] At the hearing, Hanada testified using an interpreter. He was asked: "Is it your
testimony here today that the Family Inada response to learning about the FIUS
federal registration was to propose the intellectual property rights agreement[?]"
Tr. at 81. He responded: "Yes, but I would also add that I myself thought given
the very strong relationship that we had the[n] with FIUS and the trust that existed

5

Levin that "it is difficult not to sign" the agreement but that he "totally

underst[oo]d" Levin's hesitancy to sign. *Id.* at 1–2. He continued:

> But either way, I am not sure if I can believe in the idea
> of using the names which had been used for INADA
> products if we are creating new business and try[ing] to
> make it major …. this will definitely create bloody, ugly
> war, no matter if you/we have a legal winning chance at
> legal battle. While we/you maintain INADA business, I
> think we need to build something different which can be
> utilized for new business(KT?) [sic], it is really
> unfortunate that we can't use the names which you have
> invested money, time, energy, brane [sic], everything ….
>
> Can't we come up with some different names
> newsly [sic], which still remind consumers/market to
> imagine what you have built with INADA? Similar
> sound? Similar logo, … etc?

D.I. 31-1, Ex. 3 at 2 (ellipsis in original).[2]

---

between us with FIUS, that the matter was not perceived as one that required
urgency." Tr. at 82. In light of the series of questions, objections, and arguments
by counsel that immediately preceded this question, I had substantial doubts at the
time of this testimony that Hanada understood the question to which he responded.
In any event, Kagano's explanation in his email to Levin that Family Inada's
dispute with its China distributor was the reason Family Inada sent the intellectual
property agreement to its distributors makes sense and Kagano would have had no
reason to offer this explanation were it not true. *See* D.I. 31-1, Ex. 3. Kagano's
explanation is also consistent with other portions of Hanada's testimony and with
Hanada's sworn declaration that the agreement was sent to all distributors, not just
FIUS. D.I. 44, ¶ 5.

[2] Levin testified at the hearing that "KT" stands for Kon Tai, the company that
manufactures the chairs FIUS currently sells under the DREAMWAVE mark. Tr.
164–165.

6

Levin and Kagano did not come up with a different name, but they did launch their new business, which they called "Project X." D.I. 31–1, Ex. 5; tr. at 164–65. The scheme was simple. First, FIUS would not execute the intellectual property agreement or otherwise acknowledge Family Inada's ownership of the DREAMWAVE mark. Then, FIUS would slowly unwind its business with Family Inada, find a different manufacturer (*i.e.*, KT) to build a chair similar to the DREAMWAVE, and then launch that new chair under the DREAMWAVE mark. D.I. 31–1, Ex. 5.

Once it became clear that FIUS would not sign the intellectual property agreement and not knowing that Kagano was being paid by FIUS, Family Inada employed Kagano to interpret and facilitate communications with Levin to resolve the parties' dispute over the ownership of the mark. Tr. 86–87.

Levin and Kagano intentionally slow-walked the negotiations with Family Inada as they worked to develop and launch their competing massage chair. They led Family Inada to believe that Levin was constrained by "corporate governance and banking issues" from assigning the registered DREAMWAVE mark to Family Inada. *See* D.I. 45, ¶¶6-7 and Ex. 21; D.I. 31-1, Ex. 4. And they stalled the parties' negotiations to resolve their ownership dispute. As Kagano put it in an email to Mr. Levin:

> When you write a letter [to Inada], I think you could imply
> that you need upto [sic] 1 year or so to completely fade out

7

> [DREAMWAVE] and unify [sic] to INADA to avoid
> market confusion/drastic dropping [sic] the sales etc., even
> though you want to meet his request as soon as possible.
> Let's drag as much as we can . . . we may be able to
> threaten him not to be too [sic] hurry us by telling him
> quick change will create unrecoverable sales drop, and
> brand hurting [sic].  Please show me your draft tomorrow
> and let's complete it by Monday . . .

D.I. 31–1, Ex. 5 (ellipsis in original).  Part of "drag[ging] as much as we can"

meant lying to Family Inada about FIUS's plans for the DREAMWAVE mark.

D.I. 31–1, Ex. 5.  Kagano recommended that Levin write to Family Inada agreeing

to not use the DREAMWAVE mark while simultaneously working with Levin to

start Project X "using" DREAMWAVE.  D.I. 31–1, Ex. 5.  The logic was that such

an agreement would not bind FIUS, but it would mollify Family Inada until FIUS

could bring Project X to market.

   Eventually the negotiations stalled completely, and FIUS and Family Inada

ended their working relationship in 2018.  Tr. at 83.

   In January 2019, Project X had what Levin called its "big coming out party"

at the Consumer Electronics Show (CES).  Tr. at 104.  FIUS presented at its CES

booth its new chairs from China.  Both the booth and the chairs were labeled with

the DREAMWAVE mark.  Tr. at 46.  Family Inada also attended the CES and it

was there it first learned that FIUS was using the DREAMWAVE mark on chairs

not manufactured by Family Inada.   Tr. at 47.  FIUS currently sells these non-

Family-Inada chairs as "new DREAMWAVEs."  Tr. at 48.  It also sells the Family

Inada chairs it has in stock under the name "CLASSIC DREAMWAVE."  Tr. at 48.

In May 2019, Family Inada filed this law suit.  Family Inada seeks in its complaint injunctive and monetary relief under the Lanham Act, 15 U.S.C. 1125, the Delaware Deceptive Trade Practices Act, Del. Code Ann. tit. 6, § 2532, and Delaware common law trademark infringement and unfair competition.  Family Inada also seeks cancellation of FIUS's trademarks under 15 U.S.C. §§ 1064, 1092, 1119, and 1120, and declaratory relief under 28 U.S.C. § 2201 *et seq.*

## II.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy" that "should be granted only in limited circumstances." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994) (internal quotation marks omitted).  To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits" and he will "suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The Third Circuit has equated "likely to succeed on the merits" with "a reasonable probability of eventual success in the litigation." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974).  A "reasonable probability" is "significantly better

9

than negligible but not necessarily more likely than not." *Id.* at 179.  Irreparable

harm must be established by a preponderance of the evidence.  *Id.*

If a Plaintiff can meet its burdens on the first two factors, then the Court

should consider two more factors: whether "the balance of equities tips in

[Plaintiff's] favor" and whether "an injunction is in the public interest." *Winter*,

555 U.S. at 20.  At that point, the court should balance all four factors to determine

if taken together they "favor . . . granting the requested preliminary relief." *Reilly*,

858 F.3d at 179.

## III.  DISCUSSION

### A.  Family Inada Has a Reasonable Probability of Eventual Success in the Litigation.

For Family Inada to succeed on the merits, it must establish that it is the

rightful owner of the DREAMWAVE mark.  Under Third Circuit law, when a

manufacturer and its exclusive distributor each claim ownership of a trademark,

courts apply the *Covertech* test.  *See Covertech Fabricating, Inc. v. TVM Building

Prods., Inc.*, 855 F.3d 163 (3d Cir. 2017).  Courts presume in such cases that the

manufacturer owns the trademark unless the distributor can rebut that presumption

using a six-factor balancing test.  *Id.* at 171.  The *Covertech* factors are:

> (1) which party invented or created the mark;
>
> (2) which party first affixed the mark to goods sold;

(3) which party's name appeared on packaging and promotional materials in conjunction with the mark;

(4) which party exercised control over the nature and quality of goods on which the mark appeared;

(5) to which party did customers look as standing behind the goods, *e.g.*, which party received complaints for defects and made appropriate replacement or refund; and

(6) which party paid for advertising and promotion of the trademarked product.

*Id.* There is a "thumb on the ownership scale in favor of the manufacturer" but a court should still perform "a thorough, individualized analysis of each case." *Id.* That analysis should "consider the various indicia of ownership designed to elicit the roles and responsibilities of the parties and the expectations of consumers in order to gauge whether, in a given case, the distributor and not the manufacturer operated as the rightful owner of the contested mark." *Id.*

In its brief filed in opposition to Family Inada's preliminary injunction motion, FIUS argued that *Covertech* did not apply to this case and that FIUS was the presumptive owner of the DREAMWAVE mark because FIUS had successfully petitioned the USPTO to register the mark in its name. D.I. 30 at 6. In FIUS's words: *Covertech* "only applies to resolving ownership of an 'unregistered' mark, which is not the case here." D.I. 30 at 6. In fact, the contested mark in *Covertech*, like the DREAMWAVE mark in this case, had been registered by the distributor. 853 F.3d at 169. At the preliminary injunction

11

hearing, FIUS agreed that *Covertech* governs the parties' ownership dispute.  Tr. at
28.  Accordingly, I examine the six *Covertech* factors in turn and then consider
them in their totality.

**1.     Creator of the Mark**

The parties agree that Levin created the DREAMWAVE mark.  Tr. at 54–
56.  Thus, the first factor weighs in FIUS's favor.

**2.     First to Affix the Mark**

The parties agree that Family Inada first affixed the DREAMWAVE mark to
a massage chair.  Tr. at 56.  Thus, the second factor weighs in Family Inada's
favor.

**3.     Name on Packaging and Promotional Materials**

The parties agree that Family Inada's name appeared in conjunction with the
DREAMWAVE mark on packaging and promotional materials.  Tr. at 56–57.  The
shipping box for the DREAMWAVE chair had Family Inada's name on it.  Tr. at
56.  The chair's user manual had Family Inada's name on it.  D.I. 51.  FIUS used
Family Inada's name throughout its website and sales materials, and routinely
presented itself as simply "Inada" in an effort to tie itself to the larger Family Inada
name and reputation.  Tr. at 57., 127–128.  Thus, the third factor weighs in Family
Inada's favor.

### 4.  Control Over the Nature and Quality of the Marked Goods

The parties agree that Family Inada exercised control over the nature and quality of the DREAMWAVE massage chairs it manufactured. Tr. at 56. FIUS had no role in the manufacturing process and no responsibility for design or quality control. Insofar as FIUS had any input, it was in the form of suggestions Family Inada was free to ignore. Tr. at 58. Thus, the fourth factor weighs in Family Inada's favor.

### 5.  The Party Viewed as Standing Behind the DREAMWAVE

Although FIUS performed the warranty service for the DREAMWAVE chairs, it marketed the warranty as a manufacturer's warranty and presented itself as Inada when it interacted with customers. Tr. at 143–44. In written materials and on its website, for example, FIUS put the Inada name next to the phone number customers were given to call for technical assistance and warranty work. D.I. 51. When customers called that number, the service representative would pick up and say something to the effect of "[t]hank you for calling Inada." Tr. at 140. Although Levin is likely correct that customers did not believe that their chairs would be serviced in Japan, the only reasonable inference customers would draw from FIUS's use of the Inada name and marks was that Family Inada serviced and stood behind the DREAMWAVE chairs. Tr. at 145–46. Thus, Family Inada has

shown that customers looked to it as standing behind the product and the fifth factor weighs in its favor.

### 6.     The Party Responsible for Advertising and Promotion

The parties agree that FIUS paid for and oversaw the advertising and promotion of the DREAMWAVE chair in the United States. Tr. at 58.  FIUS's role as distributor was to promote and sell the product, and it alone did that work in the United States. Tr. at 122; Tr. at 94.  Thus, the sixth factor weighs in FIUS's favor.

### 7.     The Totality of the *Covertech* Factors Favors Family Inada

Having reviewed all six factors, I conclude that it is likely that Family Inada would succeed at trial in establishing its ownership of the DREAMWAVE mark. Four of the six factors favor Family Inada. "While a mere counting of the factors is not dispositive," *Covertech*, 855 F.3d at 174, the number and relative weight of the factors strongly favor Family Inada. "The function of a trademark is to identify the origin or ownership of the article; the essence of the wrong is the passing off of the goods of one manufacturer or vendor as those of another." *Dresser Indus., Inc. v. Heraeus Engelhard Vacuum, Inc.*, 395 F.2d 457, 461 (3d Cir. 1968) (citing *Delaware & Hudson Canal Co. v. Clark*, 80 U.S. (13 Wall.) 311, 322 (1871)). Family Inada made the original DREAMWAVE chair, and FIUS intentionally— and successfully—marketed the chair as a Family Inada product.  Although FIUS

14

created the mark, that is less important than what the mark did for the past

decade—namely, signify that chairs marked DREAMWAVE were manufactured,

guaranteed, and serviced by Family Inada.  In short, I find that in light of the

presumption of ownership Family Inada enjoys and the four *Covertech* factors that

weigh heavily in its favor, Family Inada has a reasonable probability of proving at

a trial it owns the DREAMWAVE mark.  It has therefore met its burden to show a

likelihood of success on the merits.

**B.    Family Inada Can Show Irreparable Harm**

A party moving for a preliminary injunction in a trademark case "is not

entitled to a presumption of irreparable harm[.]"  *Ferring Pharm., Inc. v. Watson*

*Pharm., Inc.*, 765 F.3d 205, 217 (3d Cir. 2014).  Instead the movant "is required to

demonstrate that she is likely to suffer irreparable harm if an injunction is not

granted."  *Id.*  A "critical aspect" of fact finding in this context is "drawing

reasonable inferences from facts in the record."  *Groupe SEB USA, Inc. v. Euro-*

*Pro Operating LLC*, 774 F.3d 192, 205 (3d Cir. 2014).  Bases for irreparable harm

in Lanham Act cases include "loss of control of reputation, loss of trade, and loss

of goodwill."  *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir.

1992).  The Court may only grant a preliminary injunction when a movant has

made "a clear showing of a likelihood of irreparable harm."  *Groupe*, 774 F.3d at

204. The movant must make this showing by a preponderance of the evidence.
*See Reilly*, 858 F.3d at 179.

Based on the evidence adduced at the preliminary injunction hearing, I find
that Family Inada has made a clear showing that, absent an injunction, it will suffer
irreparable harm in the form of lost reputation and good will. The record makes
clear—indeed, it is essentially undisputed—that Family Inada's DREAMWAVE
chair is an iconic brand tied to a premium massage chair known to be of high
quality and, most importantly, known to be made and serviced by Family Inada. It
is similarly clear that FIUS is openly trading on Family Inada's reputation and
goodwill associated with the DREAMWAVE mark to promote sales of the new
DREAMWAVE chair. For example, Ian Hays, FIUS's Vice President of Sales,
stated in a recent marketing video made with a prominent massage chair dealer that
FIUS, in developing the new DREAMWAVE chair, "sought to add to the
DREAMWAVE story" that traces its roots to the original DREAMWAVE chair,
which FIUS now labels the "DREAMWAVE Classic." D.I. 20–1 at 185. In Hays'
words:

> the DreamWave Classic ... has been in the market for 10
> years and really we believe [it] is an iconic massage chair
> in the premium massage chair category, something
> certainly that is recognized. So for those loyal followers
> or those people that have owned DreamWave in the past,
> this is something that has been long awaited, the release of
> a new DreamWave.

16

D.I. 20–1 at 185.  At a later point in the video, Hays and the dealer engaged in the

following discussion:

> **Dealer**: And the warranty on this chair is going to
> be similar to all the other DreamWave products or the
> other products you sell?
> **Hayes**: Yeah, I really appreciate the plug on our
> service and we believe that when you purchase a luxury
> product you deserve to experience luxury after the sale,
> service and I know your company pays a great deal of
> attention to that as well, and yes we have not sacrificed on
> that with the new DreamWave it continues to be the three-
> year all parts, all labor, in-service home warranty that our
> customers have enjoyed for, since forever.
> **Dealer**: Since you started.
> **Hayes**: Yeah, since we started.
> **Dealer**: Well Inada's fantastic that way.  You have
> great customer support . . .

D.I. 20–1 at 189.  This exchange makes clear that FIUS knows that customers

equate Family Inada with the high quality and service associated with the

DREAMWAVE mark.  Hays began the video by promoting FIUS's new chair as a

continuation of Family Inada's DREAMWAVE story and he did nothing to

disabuse the dealer of the notion that FIUS and Inada are one and the same.  In this

way, he implemented the strategy Levin and Kagano discussed when they were

developing Project X—that is, to "remind consumers/market to imagine what you

have built with INADA[.]"  D.I. 31-1, Ex. 3 at 2.

When FIUS was Family Inada's distributor in the United States, it presented

itself to the market as part of Family Inada by using the Inada name and

17

DREAMWAVE mark. Although no longer connected to Family Inada, FIUS is still using the DREAMWAVE name to try and capitalize on Family Inada's reputation and good will. Accordingly, Family Inada has shown that it will be irreparably harmed absent an injunction enjoining FIUS from using the DREAMWEAVE mark.[3]

### C.   FIUS Waived Any Argument on the Equitable or Public Interest Considerations

FIUS did not address the equitable and public-interest considerations of the preliminary injunction analysis in its Answering Brief or at the preliminary injunction hearing. *See* D.I. 30, Tr. at 201. "It is well established that failure to raise an issue . . . constitutes a waiver of the argument." *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1298 (3d Cir. 1991). Even so, the Court will briefly discuss those considerations and how they favor Family Inada.

---

[3] Family Inada advanced two other arguments for why it will be irreparably harmed unless the Court grants an injunction: (1) Its new United States distributor is "reluctant" to sell Family Inada's DREAMWAVE chairs while this litigation is ongoing, tr. 51; and (2) it has lost or will lose market share, D.I. 7 at 19. Family Inada, however, did not adduce evidence to establish that its new distributor had refused to sell Family Inada chairs absent an injunction. And it failed to adduce any evidence to show that it had lost sales or market share. Accordingly, I gave no weight to these arguments.

When considering the balance of equities, a court must "explore the relative harms to applicant and respondent[.]" *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). As explained above, Family Inada has shown that it will be harmed by losing control of its reputation, the reputation of the DREAMWAVE, and the good will those reputations fostered. In contrast, to the extent FIUS will be injured by not being able to sell its new chair using the DREAMWAVE mark, that injury "may be discounted by the fact that the defendant brought that injury upon itself." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002). Thus, the equities weigh in favor of Family Inada.

As for public interest considerations, the public has an interest in not being "deceived or confused." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990). Until January 2019, chairs sold under the DREAMWAVE mark were made by Family Inada. If FIUS is permitted to sell chairs made by a different manufacturer under the DREAMWAVE mark, it will almost certainly deceive or confuse customers into believing the chairs were made by Family Inada.

The public also has an interest in not rewarding unscrupulous business practices. In a plot that unfolded over three years, FIUS made a play to take the DREAMWAVE mark, convinced Family Inada's intermediary to become a double

19

agent for FIUS, used that double agent to execute a scheme to bring a competing

chair to market under the DREAMWAVE mark, and all the while deceived Family

Inada—a longstanding and amicable business partner—as to the state of their

relationship and FIUS's intentions.

Accordingly, the public interest weighs in favor of granting the preliminary

injunction.

## D.    Waiver of Bond Requirement

Under Federal Rule of Civil Procedure 65(c), a court may issue a

preliminary injunction "only if the movant gives security in an amount that the

court considers proper . . ." Fed. R. Civ. P. 65(c). There are, however, cases in

which the bond requirement can be waived. *See Temple Univ. v. White*, 941 F.2d

201, 219–220 (3d Cir. 1991). In cases that raise the issue of a bond waiver, "the

court should consider the possible loss to the enjoined party together with the

hardship that a bond requirement would impose on the applicant." *Id.* at 219.

Defendant has not requested a bond. Tr. at 193. And the hardship FIUS faces is

minimal: Although FIUS will not be able to sell chairs using the DREAMWAVE

mark, this injunction will not prohibit it from selling chairs. Thus, the Court

determines that waiver of the bond requirement is appropriate. *Cf. Mullin v.*

*Sussex Cty., Del.*, 861 F.Supp. 2d 411, 428 (D. Del. 2012).

20

## IV.    CONCLUSION

For the above reasons, I will grant Plaintiff's motion for a preliminary injunction.

The Court will issue an Order consistent with this Memorandum Opinion.

$\left( E + N \right)$

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FAMILY INADA Co., Ltd. | Civil Action No.   **19 - 9 2 5** |
| Plaintiff, | |
| -v.- | **JURY TRIAL DEMANDED** |
| FIUS DISTRIBUTORS LLC, D.B.A. INADA USA, D.B.A. FURNITURE FOR LIFE, | |
| Defendant. | |

### [PROPOSED] ORDER

IT IS HEREBY ORDERED this **20th** day of _____**May**_____, 2019, that

Plaintiff's Motion for Leave to File Under Seal is GRANTED;

IT IS HEREBY FURTHER ORDERED that the Declaration of Masaru Hanada and its

exhibits shall be docketed under seal;

IT IS HEREBY FURTHER ORDERED that Plaintiff shall coordinate with Defendant to

file a redacted public version of the Declaration of Masaru Hanada and its exhibits within seven

(7) days of the appearance of Defendant's counsel in this action.

_____
UNITED STATES DISTRICT JUDGE

ME1 30468257v.1

N

 Gmail

**Anthony Parks <aston771@gmail.com>**

---

## FW: CaseMail: An Order(Attorney Fees Granted (OG47)) has been issued in case: 20-0850 (Category: Other)

---

**Roy Granoff <roy@gandklaw.com>**
To: Anthony Parks <aston771@gmail.com>

Wed, Jul 7, 2021 at 12:29 PM

Just wanted to give you the chance to keep the attorney's fees down.

We did get money from you -- sold the Mercedes for good money!

And the Lexus too.

*Roy E. Granoff, Esq.*

*Law Offices of Granoff & Kessler*

*7990 S.W. 117 Ave., Suite 201*

*Miami, FL 33183*

*(305) 596-0200*

*fax (305) 271-8170*

*roy@gandklaw.com*

[Quoted text hidden]

Anthony Parks
130 W. Pleasant Ave
#327
Maywood, N.J. 07607

To: Clerk of Court

See the summons and complaint
If any questions.

561-703-1283
561-703-1283

Aston771 @GMAIL.COM

ENC; $405.00



05/10/24 12:52





**This envelope is only for FedEx Express® shipments.**

You can help us get your package safely to its destination by packing your items securely. Need help? Go to **fedex.com/packaging** for packing tips.

Check your FedEx Express shipping document, the current FedEx Service Guide, or the conditions of carriage for complete terms, conditions, and limits of liability.

© 2023 FedEx 155475/155476 REV 11/23



PAP 21

Please recycle. See how we are connecting the world in responsible and resourceful ways at **fedex.com/sustainability**. Recycling options may vary by location.

◄ Insert shipping document here.



Made from 100%
recycled paperboard

**Scan to learn how we can help make Earth a priority together.**